Harry Schroeder and Amanda Schroeder v. Commissioner.
Schroeder v. Commissioner
Docket No. 37046.
United States Tax Court
T.C. Memo 1957-162; 1957 Tax Ct. Memo LEXIS 87; 16 T.C.M. (CCH) 707; T.C.M. (RIA) 57162; August 27, 1957
*87 Held, respondent's determination of deficiencies in petitioner's income tax under the net worth plus expenditures method, with certain adjustments, upheld for the years 1944, 1945, 1946 and 1947; Held, further, a part of the deficiencies for each of the years 1944, 1945, 1946 and 1947 was due to fraud with intent to evade tax; Held, further, subject to our findings of fact, the determination of the respondent of the net operating loss suffered in 1948 and 1949 is sustained; Held, further, respondent is sustained in his disallowance of the amount $12,070.48, representing Iowa income tax, in computing the amount of the net operating loss carryback to 1946 from 1948; Held, further, petitioner is liable for additions to tax for failure, due to wilful neglect and not to reasonable cause, to file a timely return within the meaning of sections 291(a) and 51 of the 1939 Internal Revenue Code. Leland C. White, Esq., and Bert B. Rand, Esq., 300 Denrike Building, Washington, D.C., for the petitioners. Ray H. Garrison, Esq., for the respondent. MULRONEY Memorandum Findings of Fact and Opinion Respondent determined deficiencies in income tax and additions to tax for the years 1942 and 1944 through *88 1947, inclusive, as follows: Additions to Tax
Year
Deficiency
Sec. 293(b)
Sec. 291(a)
1942
$ 43,608.93
$ 21,804.47
1944
127,614.56
63,807.28
1945
121,082.88
60,541.44
1946
139,116.67
158,558.42
$79,279.21
1947
248,122.51 Respondent also claims by an amended answer an increased deficiency in income tax for the year 1946 in the amount of $10,325.35. The issues presented are (1) whether petitioners understated their net income from business during the years 1942, 1944, 1945, 1946 and 1947 in the amounts of $65,022.80, $165,637.55, $153,519.89, $377,920.80 and $24,925.31 respectively; (2) whether petitioners are entitled to a deduction in 1946 for a net operating loss carry-back from the year 1948 in an amount in excess of the $225,674.66 deduction allowed petitioners in the statutory notice of deficiency; (3) whether petitioners are liable for an increased deficiency of $10,325.35 for 1946 because the deduction of $225,674.66 allowed to the petitioners in the statutory notice of deficiency for a net operating loss carry-back from 1948 is excessive to the extent of $12,070.48; (4) whether petitioners are entitled to a deduction in 1947 for a net operating loss carry-back from 1949 in an amount in excess *89 of $166,396.69; (5) whether petitioners are liable for additions to tax under section 291(a) for failure to file a timely return for the year 1946; (6) whether any part of the deficiencies for the years 1942, 1944, 1945 and 1946 was due to fraud with intent to evade tax; and (7) whether the assessment of the deficiency for the year 1942 is barred by the statute of limitations. Certain of the adjustments made in the determination of the deficiencies have been agreed to by stipulations, and effect will be given to such stipulations in the Rule 50 computations. Respondent did not allow any net operating loss deduction for 1947 in the statutory notice of deficiency. He now concedes that petitioners sustained a net operating loss in 1949 in the amount of $170,024.36 and that petitioners are entitled to a net operating loss deduction in 1947, representing a carry-back from 1949, in the amount of $166,396.69. Findings of Fact Harry and Amanda Schroeder, husband and wife, are residents of Tabor, Iowa. Harry filed an individual income tax return for 1942, 1944 and 1945, and Harry and Amanda filed joint returns for 1946, 1947, 1948 and 1949. The returns for all the years here included were filed *90 with the then collector of internal revenue for the district of Iowa. Harry will hereinafter be referred to as the petitioner. Amanda, whom the petitioner married in 1921, had two years of training as a nurse and was formerly a clerk in a store. Petitioner obtained a sixth grade education and Amanda an eighth grade education. Neither of them had had any bookkeeping or any other formal business education. Petitioner has been in the cattle feeding business all of his adult life. Cattle were purchased periodically by petitioner from livestock commission merchants, livestock brokers, and dealers in several western states Matured grass fed cattle were selected, normally two and three years old, and brought to petitioner's feed lots where they were fed until they reached marketable weights, at which time they were sold as beef cattle. There was no consistent pattern in the size of the purchases made. Such purchases ranged from a few dozen cattle to more than 2,000 cattle. Cattle were fed by the petitioner anywhere from 30 days to four or five months. The point at which the cattle were marketed also depended on the prevailing market price. The immature cattle purchased were grazed until *91 they were ready for the feed lots. In the case of cattle which were put out to graze, as much as 20 months could elapse between the time such cattle were purchased and the time they were sold from the feed lots. Prior to September 1947, the petitioner conducted his principal cattle feeding business as a sole proprietor. He also participated during the years 1944 through 1949 in joint feeding ventures with other feeders. Petitioner commingled his livestock in various feeding lots, irrespective of purchase date or price paid for such livestock. He never took an actual head count or physical inventory of his livestock except for the head count made on September 27, 1947 in connection with the formation of Harry Schroeder Cattle Co., Inc. and Harry Schroeder, Inc. Petitioner did not maintain separate records or identification of the various herds. Petitioner financed his cattle purchases with loans from the Live Stock National Bank of Omaha, Nebraska, and approximately 80 per cent of his purchases were partially mortgaged. Petitioner reported his income on the cash receipts and disbursements basis. In computing his annual income, the petitioner deducted from gross receipts his computed *92 cost of the cattle sold in that year, without regard to when the cattle were purchased. In the returns filed for 1942, 1944 and 1945, the cost of livestock sold was based upon an estimate prepared by petitioner and his accountant, namely, Moseley, who was engaged primarily in farm accounting. In preparing the estimate, Moseley picked a cut-off date, which usually was on or about September 15, and assumed that all livestock purchased subsequent to that date was on hand at the end of the year. The purchase cost of the livestock assumed to be on hand at the end of the year was carried over and deducted in the following year as part of the cost of livestock sold. The estimated year-end amounts were as follows: Livestock
Costs Carried Over
Year
from Preceding Year
1942
$141,760
1944
800,095
1945
697,402
1946
496,281
1947
555,169
The 1945 return indicated that the livestock carry-over from 1945 to 1946 was $680,010.70. On the 1946 return the livestock carry-over from 1945 was reported as $496,281.05. The return for 1946 showed a livestock carry-over to 1947 in the amount of $605,300.58. The return for 1947 shows a livestock carry-over from 1946 of $555,168.88. In September 1947, petitioner formed the *93 Harry Schroeder Cattle Co., Inc., a corporation organized under the laws of Iowa. The corporation had authorized capital stock of 990,000 shares with a par value of $100. On or about the same date petitioner formed Harry Schroeder, Inc., a corporation organized under the laws of Kansas. It had an authorized capital stock of 2,500 shares with a par value of $100. Both corporations were organized to engage in the cattle feeding business. Petitioner was president and Amanda, secretary-treasurer of both corporations. In 1947 the petitioner established a meat packing business which was operated initially as an individual proprietorship under the name of Schroeder Packing Company. On September 1, 1949 the petitioner formed the Schroeder Packing Company, a corporation organized under the laws of the State of Delaware. Petitioner and his wife acquired all of the capital stock of this corporation. Petitioner has been president of the corporation since its incorporation, and Amanda, secretary-treasurer. Petitioner was also a partner in cattle feeding partnerships including the Schroeder-Grudle partnership. Petitioner borrowed susbtantial sums to finance his purchases of livestock. Some unsecured *94 credit was given, but most of the bank loans were secured by chattel mortgages on petitioner's feed and livestock. The Live Stock National Bank, the principal source of the petitioner's loans, took into consideration the petitioner's net worth computed on the basis of the fair market value of his assets in extending credit. Petitioner, during the years before us, visited his feeding lots almost every day and was familiar with the types and number of cattle there. Petitioner did not keep any books on his cattle feeding operations. The records of these operations consisted of bank statements, liability ledger sheets, canceled checks, bills of sale, and purchase invoices. The principal portion of petitioner's cattle business was handled over the phone, and no records or memoranda were made as to these transactions. Petitioner maintained a sales ledger for his feed stores and elevators, and he kept a memorandum book on the feeding operations conducted by the Schroeder-Grudle partnership. Amanda had control of petitioner's records. Petitioner maintained accounts in three banks. He did not deposit in these accounts all of the proceeds received by him from sales of livestock. These undeposited *95 receipts were applied directly to payments on notes payable to banks. Petitioner received a 30-day extension of time in which to file a return for 1946. On April 15, 1947, petitioner filed a tentative return for 1946 disclosing a net income of $51,500 and a tax liability of $25,479, which amount was never assessed or paid. The tentative return did not contain a computation of gross receipts, cost of livestock sold, or gross profit, and there were no schedules in the return showing how the net income was computed. On July 15, 1948 petitioner and Amanda filed a joint return for 1946. The joint return, prepared by a firm of certified public accountants retained by the petitioner, contained a schedule reflecting gross receipts, cost of livestock sold, gross profits and net income. It disclosed a tax liability of $185,374.14. The following schedule shows the petitioner's gross receipts as reported on the returns for the years 1942 and 1944 through 1946: Gross Receipts
Year
Livestock
Other
Total
1942
$1,516,093
$148,577
$1,664,670
1944
1,736,719
176,411
1,913,130
1945
2,148,547 a
264,470 b *96 2,413,017
1946
3,879,651 c The correct amounts of petitioner's gross receipts for the years 1942 and 1944 through 1946 are as follows: Correct
Amount of
Amount of
Understatement
Year
Gross Receipts
on Returns
1942
$1,754,798.08
$ 90,128.17
1944
2,104,097.34
190,967.86
1945
2,687,876.87
274,860.15
1946
3,831,879.20 a
The net income (or loss) and income tax liability reported by the petitioner for the years 1942 and 1944 through 1949 were as follows: Year
Net Income
Tax Liability
1942
$ 15,984.72
$ 4,240.97
1944
486.95
None
1945
11,839.86
2,925.75
1946
51,500.00
25,479.00 a
1947
22,135.18
7,234.91 b
1948
(286,950.67)
None
1949
(300,873.41)
None
Respondent computed the following taxable income, *97 prior to adjustment for net operating loss deduction, of the petitioner for the years involved: 1942
1944
1945
1946
1947
Net business income
$81,008
$159,881
$156,833
$377,921
$235,253
Plus: Partnership income
4,715
3,886
38,219
76,502
Net income (before personal
$81,008
$164,596
$160,719
$416,140
$311,755
deductions)
Less: personal deductions
141
500
500
500
1,100
Net taxable income
$80,867
$164,096
$160,219
$415,640
$310,655
Income reported
15,985
487
11,840
51,500 *
249,506
Unreported income
$64,882
$163,609
$148,379
$364,140
$ 61,149
In 1948 petitioner filed three amended returns for the year 1947. The amounts of net income (or loss) and tax liability reported on these returns were as follows: Date filed
Net Income
Tax Liability
7-31-48
$249,506.42
$190,480.55
10-29-48
(20,109.73)
None
211,039.24
161,056.37
Petitioner, on the returns for 1942, 1944 and 1945, computed gross profit and net business income from livestock feeding as follows: 1942
1944
1. Gross receipts
$1,516,093
2. Cost of sales: (a) Livestock costs carried
over from preceding
year
$ 141,760
$ 800,095
(b) Cost of livestock pur-
chased during year
946,611
972,355
$1,088,371
$1,772,450
(c) Livestock costs carried
over to following year
321,841
697,402
766,530
3. Gross profit
749,563
4. Deduct: (a) Cost of feed used in
feeding
$ 603,003
$ 497,696
(b) Operating expenses
130,575
172,325
733,578
5. Net business income
$ 15,985
*98 1944
1945
1. Gross receipts
$1,736,719
$2,148,547
2. Cost of sales: (a) Livestock costs carried
over from preceding
year
$ 697,402
(b) Cost of livestock pur-
chased during year
1,488,949
$2,186,351
(c) Livestock costs carried
over to following year
680,011 *
1,075,048
1,506,340
3. Gross profit
661,671
642,207
4. Deduct: (a) Cost of feed used in
feeding
$ 488,522
(b) Operating expenses
173,815
670,021
662,337
5. Net business income
($ 8,350)
($ 20,130)
Gross profit and net business income from livestock feeding and grain sales were computed by the petitioner on the 1946 return as follows: Sales of livestock and grain
$3,879,651
Cost of sales: Livestock sales carried
over from 1945
$ 496,281
Cost of livestock pur-
chased during 1946
2,623,047
$3,119,328
Livestock cost carried
over to 1947
605,301
$2,514,027
Gross Profit
1,365,624
Operating Expenses
1,147,880
Net Business Income
$ 217,744
James Moseley prepared petitioner's returns for 1942, 1944 and 1945 from records and information supplied by the petitioner, except for some data on the feed business which Moseley obtained directly from the feed mills. No bank statements of the petitioner *99 were made available to Moseley. Petitioner's final 1946 return, dated July 14, 1948, was prepared by accountants from John M. Gilchrist and Company, relying upon the bank statements as well as the original records and memoranda of the petitioner. It was not possible to compute accurately the net income of the petitioner for 1946 without the use of the bank statements. On or about December 1946 Moseley learned that the returns of the petitioner's brother had been audited by revenue agents. Moseley thereupon requested petitioner to bring him the bank statements for the years 1942, 1944 and 1945. After a review of the bank statements, Moseley discovered substantial differences between the amount of gross income reported on petitioner's returns and the amounts deposited in the petitioner's bank accounts for those years. Moseley prepared computations of additional tax due for those years and advised petitioner to file amended returns. Petitioner never filed amended returns for the years 1942, 1944 and 1945. Petitioner terminated Moseley's services shortly thereafter and, during 1947 and through the summer of 1948, employed Walter E. Whorrall, an accountant, who made an audit of the petitioner's *100 records for the years 1942 through 1946. From May 28 to July 31, 1948, John M. Gilchrist and Company, an accounting firm, made a comprehensive independent audit of petitioner's records and returns for the years 1942 through 1946 and prepared an analysis of petitioner's receipts and disbursements, as well as net income computations, for those years. The auditors determined the amount of livestock cost carry-over to 1947 from 1946 by working back from the actual physical head count made by the petitioner on September 27, 1947, with adjustments for all purchases and sales of hvestock between December 31, 1947 and September 27, 1947. Also included in this inventory were purchases of livestock made in the last two to four months of 1946. In a similar fashion, by working back, the auditors determined livestock carry-over to the years 1942, 1944, 1945, and 1946. On July 27, 1948 the John M. Gilchrist and Company prepared for the petitioner a proposed amended return for 1946 which was never filed by the petitioner. The proposed amended return for 1946 showed a net income of $250,949.40 and an income tax liability of $192,160.25. The gross profit and net business income (exclusive of income *101 from feeding operations conducted through partnership) as shown on the proposed amended return, were as follows: Gross Sales and Income
$3,879,650.65
Cost of sales: Livestock costs car-
ried over from
1945
$ 490,597.09
Cost of livestock pur-
chased during 1946
2,653,380.83
$3,143,977.92
Livestock cost carried
over to 1947
641,873.76
$2,502,104.16
Gross Profit
$1,377,546.49
Operating expenses
1,152,268.50
Net business income
$ 225,277.99 Petitioner terminated the services of John M. Gilchrist and Company on July 31, 1948. In November 1947, the respondent commenced an investigation of petitioner's tax liability as for the years here involved. On December 31, 1941, the petitioner owned real estate with a cost basis of $28,605. In 1942 the petitioner acquired real estate and an elevator from R. E. Lucas for $101,144.40, of which amount the petitioner paid $72,250 in 1942. In March 1943 the petitioner purchased the Sheer farm for $14,520 in cash, and during the same year the petitioner made a deposit of $1,180 as earnest money on additional real estate and paid $28,894.40 on real estate previously acquired. In 1944 petitioner purchased two farms at a total price of $16,800, of which $15,606.80 was paid during *102 1944. In addition, petitioner deposited $1,000 as earnest money on other real estate in 1944. In 1945 the petitioner purchased two farms for a total price of $10,894.90, of which $9,894.90 was paid in cash during 1945. Petitioner also deposited $5,213.68 as earnest money on three additional tracts of real estate in 1945. In 1946 the petitioner purchased five farms and various city lots for a total price of $100,346.75, of which the petitioner paid $93,208.71 during 1946. In addition, petitioner deposited $2,000 in cash as earnest money on another farm in 1946. The following schedule shows the total cost price of real estate owned by the petitioner at the close of 1946, 1947, 1948 and 1949: Year
Amount
1946
$261,273.49
1947
292,890.72
1948
312,492.18
1949
307,392.18
The following is a list of a portion of the checks issued by the petitioner in payment for various parcels of real estate: Date
Amount
of Check
Payee
of Check
11-16-42
R. E. Lucas
$10,000.00
10-31-44
Donald Douglass
9,891.92
12-17-44
Mike & Gretchen Mc-
Alexander
4,000.00
3- 3-45
Florence Groneweg
4,469.90
7-25-45
V. H. Patrick, Adm.
1,749.68
8-24-45
Matilda Gee
1,224.00
12-19-45
G. W. Sheer Est.
2,240.00
1-26-46
W. B. Gaylord
1,000.00
2-11-46
Atha L. Gaylord
1,150.00
2-11-46
William B. Gaylord
2,650.00
2- 4-46
Agnes Harrison
500.00
10- 9-46
Agnes Harrison
3,495.60
6-17-46
Johnson & Putnam
2,000.00
6-24-46
Richard Carder
1,000.00
8-16-46
Richard Carder & Pink-
ney Carder
11,361.90
7-18-46
Cynthia Headley
1,400.00
8-27-46
Cynthia Headley
1,400.00
$59,533.00
*103 All of the checks in the above schedule orginally had notations in the lower left corner indicating that the checks represented payments for real estate. After the checks were cashed, the notations regarding real estate were erased and new notations made indicating that the checks represented payments for "corn", "fodder", and other operating expenses. Petitioner purchased a Reo truck in October 1946 at a price of $2,638.49, which amount the petitioner paid by check dated October 18, 1946. A notation in the lower left hand corner of the check indicated that it was in payment for 1,599 bushels of corn at $1.65. On February 23, 1945 the petitioner was indebted to E. H. Lougee in the amount of $4,284.50. On that date petitioner issued a check to E. H. Lougee in the amount of $4,284.50, representing payment in full of the obligation. After the check was cashed, a notation was placed on the check that it represented payment for 4,760 bushels of corn. On September 27, 1947 the petitioner transferred 2,408 head of cattle to the Harry Schroeder Cattle Co., Inc., a corporation organized in September 1947 under the laws of Iowa. On the same date, petitioner transferred 197 head of cattle to *104 Harry Schroeder, Inc., a corporation organized under the laws of Kansas. The cost basis of the 2,408 head of cattle was $388,235.35. The cost basis of the 197 head of cattle was $25,304.75. On December 31, 1947 the petitioner's capital stock in Harry Schroeder Cattle Co., Inc., and Harry Schroeder, Inc. had a cost basis of $426,876.74 and $26,304.75, respectively. On September 1, 1949, the petitioner sold all the business assets of the Schroeder Packing Company, an individual proprietorship, to the Schroeder Packing Co., Inc., a corporation organized under the laws of the State of Delaware. On that date the amounts receivable account of the corporation showed a balance of $34,248.67. This balance did not include any portion of an account receivable from a meat dealer named Schumacher in the sum of approximately $72,000. Schumacher ceased doing business in May 1949 and he went into bankruptcy in the fall of 1949. Petitioner's capital stock in the Schroeder Packing Co., Inc. had a cost basis of $433,606.54. In the years 1944 through 1947 the Schroeder-Grudle partnership lost annually an average of.5 per cent of their livestock due to death. Petitioner did not maintain records of losses *105 due to death in the livestock feeding operations conducted by him as an individual. For the purpose of obtaining bank loans, the petitioner submitted financial statements reflecting assets (on the basis of fair market value), liabilities, and net worth during the years here involved. Statements were filed as of November 6, 1940, January 30, 1942, March 5, 1943, April 29, 1944, April 27, 1945, April 10, 1946, and February 10, 1947, and showed the following amounts: Date
Assets
Liabilities
Net Worth
11- 6-40
$ 268,925.00
$ 30,000.00
$ 238,925.00
1-30-42
476,361.00
147,035.05
329,325.95
3- 5-43
688,770.00
198,900.00
489,870.00
4-29-44
710,325.06
157,923.06
552,402.00
4-27-45
1,121,840.00
453,000.00
668,840.00
4-10-46
1,371,790.00
510,000.00
861,790.00
2-10-47
1,743,395.00
510,341.10
1,233,053.90
Respondent computed the net income of the petitioner for the years here involved by two methods: (1) the net worth method, and (2) by preparing a statement of income and expense from the petitioner's records. The net worth computation is as follows: STATEMENT OF ASSETS, LIABILITIES, AND NET WORTH OF HARRY SCHROEDER, TABOR,
IOWA AS OF DECEMBER 31, 1941 - 1946
Dec. 31,
Dec. 31,
Dec. 31,
Assets
1941
1942
1943
1. Cash in Banks
(a) Livestock Nat'l Bk.,
Omaha, Nebr.
$ 15,318.85
$ 12,847.85
$ 20,085.55
(b) First State Bk., Ta-
bor, Iowa
203.59
10,681.05
(c) Randolph St. Bk.,
Randolph, Iowa
1,249.18
746.28
2. Account Receivable -
Frank Dashner
3. Livestock
141,760.03
265,284.28
259,892.30
4. Earnest Money Deposits
on Real Estate
1,180.00
5. Real Estate
$ 28,605.00
$100,855.00
$144,269.40
6. Cost of Clearing Real Es-
tate
7. Machinery & Equipment
18,270.38
27,712.29
34,409.54
Total Assets
$203,954.26
$408,152.19
$471,264.12
Liabilities
8. Notes Payable
(a) Livestock Nat'l Bk.
(Incomplete Loans)
(b) Livestock Nat'l Bk.,
(Regular Loans)
$156,469.05
$217,955.83
$277,500.00
(c) First State Bank
10,000.00
3,029.08
(d) W. W. Glynn, Tabor,
Iowa
15,000.00
(e) George Schroeder
6,500.00
6,500.00
6,500.00
9. Due John Grudle - Part-
nership Profits
10. Mortgages Payable
(a) Travelers Ins. Co.
57,000.00
63,500.00
(b) E. H. Lougee, Inc.
10,200.00
9,950.00
6,900.00
11. Reserve for Depreciation
12,672.96
17,106.49
23,288.50
Total Liabilities
$185,842.01
$318,512.32
$395,717.58
Net Worth
18,112.25
89,639.87
75,546.54
Total Liabilities & Net
Worth
$203,954.26
$408,152.19
$471,264.12
12. Amount of Increase in Net Worth
$ 71,527.62
13. Plus: (a) Personal expenses
1,141.05
(b) Unidentified withdrawals from
bank account not supported
by cancelled check
10,338.85
(c) Unexplained difference between
amount of increase in net
worth & profit reflected on
profit & loss statement
14. Total of lines 12 & 13
$ 83,007.52
15. Minus: (a) Bank transfer (Check No. 9276
on Livestock Nat'l Bk.,
12-31-1942) in clearance
2,000.00
(b) Bank transfer (deposited
12-31-1946)
16. Net Income (before personal
$ 81,007.52
deductions)
17. Less: Personal deductions
140.98
18. Net taxable income (Per Stat.
$ 80,866.54
Notice)
*106 STATEMENT OF ASSETS, LIABILITIES, AND NET WORTH OF HARRY SCHROEDER, TABOR,
IOWA AS OF DECEMBER 31, 1941 - 1946
Dec. 31,
Dec. 31,
Dec. 31,
Assets
1944
1945
1946
1. Cash in Banks
(a) Livestock Nat'l Bk.,
Omaha, Nebr.
$ 27,009.24
$ 7,433.82
$ 6,966.63
(b) First State Bk., Ta-
bor, Iowa
157.30
43.49
11,165.73
(c) Randolph St. Bk.,
Randolph, Iowa
746.28
746.28
746.28
2. Account Receivable -
Frank Dashner
13,684.46
3. Livestock
442,532.15
402,777.10
750,532.95
4. Earnest Money Deposits
on Real Estate
1,000.00
5,213.68
2,000.00
5. Real Estate
$161,056.20
$171,951.10
$ 261,273.49
6. Cost of Clearing Real Es-
tate
4,342.50
7. Machinery & Equipment
47,737.01
68,424.38
96,089.49
Total Assets
$680,238.18
$656,589.85
$1,146,801.53
Liabilities
8. Notes Payable
(a) Livestock Nat'l Bk.
(Incomplete Loans)
$ 43,251.88
(b) Livestock Nat'l Bk.,
(Regular Loans)
294,937.77
$190,000.00
$ 200,000.00
(c) First State Bank
10,000.00
(d) W. W. Glynn, Tabor,
Iowa
12,000.00
(e) George Schroeder
6,500.00
6,500.00
6,500.00
9. Due John Grudle - Part-
nership Profits
2,215.46
(9,398.80)
13,222.84
10. Mortgages Payable
(a) Travelers Ins. Co.
53,500.00
45,000.00
73,950.00
(b) E. H. Lougee, Inc.
4,100.00
11. Reserve for Depreciation
30,272.02
38,726.76
49,039.15
Total Liabilities
$446,777.13
$270,827.96
$ 352,711.99
Net Worth
233,461.05
385,761.89
794,089.54
Total Liabilities & Net
Worth
$680,238.18
$656,589.85
$1,146,801.53
12. Amount of Increase in Net Worth
$157,914.51
$152,300.84
$ 408,327.65
13. Plus: (a) Personal expenses
6,578.63
5,366.44
8,794.23
(b) Unidentified withdrawals from
bank account not supported
by cancelled check
52.66
2,907.95
1,805.60
(c) Unexplained difference between
amount of increase in net
worth & profit reflected on
profit & loss statement
50.50
143.72
212.29
14. Total of lines 12 & 13
$164,596.30
$160,718.95
$419,139.77
15. Minus: (a) Bank transfer (Check No. 9276
on Livestock Nat'l Bk.,
12-31-1942) in clearance
(b) Bank transfer (deposited
12-31-1946)
3,000.00
16. Net Income (before personal
$164,596.30
$160,718.95
$ 416,139.77
deductions)
17. Less: Personal deductions
500.00
500.00
500.00
18. Net taxable income (Per Stat.
$164,096.30
$160,218.95
$ 415,639.77
Notice)
*107 STATEMENT OF ASSETS, LIABILITIES, AND NET WORTH OF HARRY SCHROEDER,
TABOR, IOWA AS OF DECEMBER 31, 1947-1949
Assets
Dec. 31, 1947
Dec. 31, 1948
Dec. 31, 1949
1. Cash in Banks
(a) Live Stock Nat'l Bank,
$ 11,001.98
$ (3,454.04)
$ (13,964.00)
Omaha, Nebr.
(b) First State Bank, Tabor,
12,253.30
170.82
(148.10)
Iowa
2. Accounts Receivable
(a) Frank Dashner, Glenwood,
15,306.76
Iowa
(b) Harry Schroeder Cattle
69,288.56
Co., Inc. & John Grudle
(c) Allen Mactier, Omaha,
.76
.76
Nebr.
(d) Harry Schroeder Cattle
50,000.00
48,441.00
Co., Inc., Tabor, Iowa
(e) Harry Schroeder, Inc.,
40,000.00
18,764.75
Tabor, Iowa
(f) Elden J. Grudle, Malvern,
19,769.33
6,836.69
6,836.69
Iowa
3. Livestock
41,625.68
72,949.02
4. Real Estate
292,890.72
312,492.18
307,392.18
5. Costs of Clearing Real
5,522.50
5,732.50
5,732.50
Estate
6. Machinery and Equipment
120,482.97
133,339.10
146,623.44
7. Investments
(a) Net Worth - Schroeder
124,052.86
70,685.97
Packing Company (not Inc.)
Glenwood, Iowa
(b) Capital stock - Harry
426,876.74
426,876.74
426,876.74
Schroeder Cattle Co., Inc.
(c) Capital stock - Harry
26,304.75
26,304.75
26,304.75
Schroeder, Inc.
(d) Capital stock - Schroeder
505,984.38
Packing Co., (Inc.) Glenwood,
Ia.
Total Assets
$1,255,376.91
$1,046,191.22
$1,484,587.60
Liabilities
8. Notes Payable
(a) Live Stock National Bank
$ 85,045.63
(b) First State Bank
$ 10,000.00
10,000.00
(c) George Schroeder
$ 6,500.00
6,500.00
6,500.00
9. Accounts Payable
(a) John Grudle - Partnership
45,678.04
16,678.04
13,678.04
Profits
(b) Elmo Grudle - Partnership
11,615.57
11,115.57
11,115.57
Profits
(c) Schroeder Packing Company
204.35
(Inc.)
(d) Harry Schroeder, Inc.
43,359.14
(e) Harry Schroeder Cattle
516,211.92
Co., Inc.
10. Mortgages Payable
(a) Travelers Insurance
51,650.00
96,350.00
90,550.00
Company
(b) Metropolitan Life
7,500.56
7,000.56
16,500.56
Insurance Company
(c) Equitable Life Insurance
13,982.50
13,440.00
Company
11. Reserve for Depreciation
61,437.61
76,168.26
93,137.52
Total Liabilities
$ 184,381.78
$ 237,794.93
$ 899,742.73
Net Worth
$1,070,995.13
$ 808,396.29
$ 584,844.87
Total Liabilities and Net
$1,255,376.91
$1,046,191.22
$1,484,587.60
Worth
12. Amount of Increase or
$ 276,905.59
$ (262,598.84)
$ (223,551.42)
(Decrease) in Net Worth
13. Plus
(a) Personal expenses
32,085.49
52,896.70
53,527.06
(b) Unidentified withdrawals
3,262.93
from bank account not
supported by cancelled check
(c) Unexplained difference
0
0
0
between amount of increase in
net worth and profit reflected
on profits and loss statement
14. Total of Lines 12 and 13
$ 312,249.01
$ (209,702.14)
$ (170,024.36)
15. Minus - unexplained
494.44
difference between amount of
increase in net worth and
profit reflected on profit and
loss statement
16. Net Income (before
$ 311,754.57
$ (209,702.14)
$ (170,024.36)
personal deduction)
17. Less: Personal deductions
1,100.00
18. Net Taxable Income
$ 310,654.57
$ (209,702.14)
$ (170,024.36)
*108 The statement of income and expenses prepared by the respondent is as follows: STATEMENT OF INCOME AND EXPENSES OF HARRY SCHROEDER, TABOR, IOWA
FOR TAXABLE YEARS 1942 THROUGH 1946
1942
1943
1944
1. Deposits: (a) Live Stock Nat'l. Bank,
Omaha, Nebr.
$1,921,380.59
$2,330,485.22
$2,418,920.44
(b) First State Bank, Tabor,
Iowa
26,252.29
298,778.98
152,068.52
(c) Randolph State Bank, Ran-
dolph, Iowa
159,060.18
13,500.00
Total Deposits - All Banks
$2,106,693.06
$2,642,764.20
$2,570,988.96
2. Add - Income Not Deposited: (a) Income Applied on Loans: Live Stock Nat'l. Bk.
$ 48,747.06
$ 39,745.40
$ 21,241.57
(b) Unidentified Loan Pay-
ments: First State Bank
20,932.51
4,630.94
W. W. Glynn, Tabor,
Iowa
3,000.00
(c) Portion of Deposited
Checks Taken in Cash
(d) Livestock Sales Not De-
posited
312.67
Total Deposits and Income
Not Deposited
$2,155,440.12
$2,703,484.78
$2,599,861.47
3. Deduct - Non-Income Items: (a) Deposited Loan Proceeds: Live Stock Nat'l. Bank
$ 322,366.00
$ 513,400.00
$ 325,000.00
First State Bank
13,500.00
38,761.59
7,000.00
(b) Bank Corrections - Live
Stock Nat'l. Bank
3,276.04
2,768.40
(c) Bank Transfers: Live Stock Nat'l. Bank
25,000.00
First State Bank
Randolph State Bank
61,500.00
13,500.00
(d) Livestock Sales of Schroe-
der-Grudle Partnership -
Live Stock Nat'l. Bk.
163,764.13
(e) Re-deposit of Dishonored
Check - Live Stock Nat'l.
Bk.
(f) Livestock Sales of Schroe-
der-Mactier Partnership -
Live Stock Nat'l. Bank
(g) Sale of Real Estate -
Live Stock Nat'l. Bank
(h) Check Charged Back -
Live Stock Nat'l. Bank
Total Non-Income Items
$ 400,642.04
$ 593,429.99
$ 495,764.13
4. Total Gross Receipts
$1,754,798.08
$2,110,054.79
$2,104,097.34
5. Less: (a) Cost of Livestock Sold: Cattle
$ 981,534.30
$1,099,640.75
$ 984,671.74
Hogs
7,107.97
7,311.66
33,057.01
Sheep
781.00
44,383.03
Mules
5,505.00
(b) Operating Expenses
675,209.76
993,584.73
875,121.19
(c) Depreciation
4,433.53
6,182.01
6,983.52
6. Difference between Line 4 and
Line 5
$ 81,007.52
$ 2,554.64
$ 159,880.85
7. Plus Partnership Income: (a) Schroeder & Grudle
4,715.45
(b) Schroeder & Mactier
8. Net Income (Before personal
deductions)
$ 81,007.52
$ 2,554.64
$ 164.596.30
9. Less: Personal Deductions
140.98
719.33
500.00
10. Net Taxable Income (Per
Statutory Notice)
$ 80,866.54
$ 1,835.31
$ 164,096.30
*109 STATEMENT OF INCOME AND EXPENSES OF HARRY SCHROEDER, TABOR, IOWA
FOR TAXABLE YEARS 1942 THROUGH 1946
1945
1946
1. Deposits: (a) Live Stock Nat'l. Bank,
Omaha, Nebr.
$3,358,948.38
$5,286,883.21
(b) First State Bank, Tabor,
Iowa
182,053.67
216,147.25
(c) Randolph State Bank, Ran-
dolph, Iowa
Total Deposits - All Banks
$3,541,002.05
$5,503,030.46
2. Add - Income Not Deposited: (a) Income Applied on Loans: Live Stock Nat'l. Bk.
$ 35,000.00
$ 18,882.49
(b) Unidentified Loan Pay-
ments: First State Bank
9,000.00
W. W. Glynn, Tabor,
Iowa
3,000.00
(c) Portion of Deposited
Checks Taken in Cash
1,100.00
(d) Livestock Sales Not De-
posited
Total Deposits and Income
Not Deposited
$3,588,002.05
$5,523,012.95
3. Deduct - Non-Income Items: (a) Deposited Loan Proceeds: Live Stock Nat'l. Bank
$ 644,000.00
$1,001,500.00
First State Bank
10,000.00
(b) Bank Corrections - Live
Stock Nat'l. Bank
3,951.52
(c) Bank Transfers: Live Stock Nat'l. Bank
First State Bank
2,000.00
67,800.00
Randolph State Bank
(d) Livestock Sales of Schroe-
der-Grudle Partnership -
Live Stock Nat'l. Bk.
249,949.91
535,800.85
(e) Re-deposit of Dishonored
Check - Live Stock Nat'l.
Bk.
223.75
(f) Livestock Sales of Schroe-
der-Mactier Partnership -
Live Stock Nat'l. Bank
52,896.60
(g) Sale of Real Estate -
Live Stock Nat'l. Bank
4,000.00
(h) Check Charged Back -
Live Stock Nat'l. Bank
19,136.30
Total Non-Income Items
$ 900,125.18
$1,691,133.75
4. Total Gross Receipts
$2,687,876.87
$3,831,879.20
5. Less: (a) Cost of Livestock Sold: Cattle
$1,520,097.46
$2,189,810.92
Hogs
50,466.18
115,683.33
Sheep
6,243.03
8,015.27
Mules
37,846.10
(b) Operating Expenses
945,782.25
1,092,290.39
(c) Depreciation
8,454.74
10,312.39
6. Difference between Line 4 and
Line 5
$ 156,833.21
$ 377,920.80
7. Plus Partnership Income: (a) Schroeder & Grudle
3,885.74
49,621.64
(b) Schroeder & Mactier
(11,402.67)
8. Net Income (Before personal
deductions)
$ 160,718.95
$416,139.77
9. Less: Personal Deductions
500.00
500.00
10. Net Taxable Income (Per
Statutory Notice)
$ 160,218.95
$ 415,639.77
*110 STATEMENT OF INCOME AND EXPENSES OF HARRY SCHROEDER,
TABOR, IOWA FOR TAXABLE YEARS 1947 THROUGH 1949
1947
1948
1949
1. Deposits
(a) Live Stock Nat'l. Bank,
$5,617,149.92
$484,186.59
$173,099.92
Omaha, Nebraska
(b) First State Bk., Tabor, Iowa
204,304.27
296,630.44
146,738.83
(c) First St. Bk. - Elevator
63,305.76
Acct., Tabor, Iowa
Total Deposits - All Banks
$5,821,454.19
$780,817.03
$383,144.51
2. Add - Income Not Deposited: (a) Income Applied on Loans:
$ 277,406.98
Live Stock Nat'l. Bk.
(b) Livestock Sales Not
8,342.25
Deposited
(c) Portion of Deposited Checks
500.00
Taken in Cash
(d) Trucking Income Due from
$ 4,631.71
Schroeder Packing Co.
(e) Portion of Sale Price of
2,000.00
Farm to Wanamaker Applied on
Mortgages
Total Deposits & Income Not
$6,107,703.42
$780,817.03
$389,776.22
Deposited
3. Deduct - Non-Income Items: (a) Deposited Loan Proceeds: Live Stock Nat'l. Bk.
$ 990,341.10
$256,500.00
$ 76,147.41
First State Bank
70,000.00
Metropolitan Life Ins. Co., New
10,000.00
York, N. Y.
Schroeder Cattle Co., Inc.,
39,763.56
Tabor, Iowa
Harry Schroeder, Inc., Tabor,
36,031.34
Iowa
Schroeder Packing Co., Glenwood,
38,622.50
Iowa
(b) Bank Corrections: Live Stock Nat'l. Bk.
61,937.98
41,710.75
1,500.00
First State Bank
(c) Bank Transfers: Live Stock Nat'l. Bk.
3,250.00
First State Bank
38,000.00
4,246.47
First State Bank - Elevator
3,100.00
Account
(d) Partnership Sales - Live
669,459.73
136.61
Stock Nat'l. Bank: Schroeder &
John Grudle
Schroeder & Mactier
62,947.97
Schroeder & Elden J. Grudle
114,289.30
40,850.03
(e) Sale of Real Estate - First
500.00
32,050.00
State Bank
(f) Livestock Sales - Harry
148.85
Schroeder Cattle Co., Inc.
(g) Charge off of old Accts.
792.76
Receivable which were
transferred to Schroeder Packing
Co. (Corp.), Glenwood, Iowa
(h) Cost of Farm Sold to
5,600.00
Wanamaker
Total Non-Income Items
$1,937,476.08
$441,396.24
$219,054.04
4. Total Gross Receipts
$4,170,227.34
$339,420.79
$170,722.18
5. Less: (a) Costs of Livestock Sold: Cattle
$2,310,825.49
$ 260.00
Hogs
106,740.55
1,521.25
Sheep
1,080.11
50.00
Mules
22,496.65
(b) Operating Expenses
1,479,925.03
330,171.51
$196,376.89
(c) Operating Loss - Schroeder
220,784.74
127,400.39
Packing Company (Not Inc.)
(d) Depreciation
13,906.38
14,730.65
16,969.26
6. Difference between Line 4 &
$ 235,253.13
($228,097.36)
($170,024.36)
Line 5
7. Plus: (a) Partnership Income: Schroeder & John Grudle
80,070.77
Schroeder & Mactier
15,000.00
Schroeder & Elden J. Grudle
(18,569.33)
13,432.63
(b) Capital Gain - Land near
4,962.59
Gordon, Neb.
8. Net Income (Before personal
$ 311,754.57
($209,702.14)
($170,024.36)
deductions)
9. Less: Personal Deductions
1,100.00
10. Net Taxable Income or (Loss)
$ 310,654.57
($209,702.14)
($170,024.36)
*111 Petitioner had livestock on hand as of December 31, 1941 with a cost basis to him in the amount of $262,000. A part of the deficiencies for each of the years 1944 through 1947, inclusive, was due to fraud with intent to evade tax. Opinion MULRONEY, Judge: Respondent computed the petitioner's taxable income for the years 1942 and 1944 through 1947 under alternative methods: (1) the net worth method and (2) a statement of income and expense drawn from the available records and memoranda of the petitioner. Both computations arrive at the same total taxable income for the years involved. However, since the sources of both computations are fundamentally the same, and since any weakness in one computation will be equally reflected in the other, it is necessary for us to keep our discussion in this opinion to the net worth computation prepared by the respondent. Petitioner does not seriously dispute the use by the respondent of the net worth method. Petitioner's principal source of income for the years before us was the cattle feeding operations, and he did not keep any books on these operations or for the other livestock feeding operations conducted by him. It is clear that the respondent *112 was justified in his use of the net worth method of computing petitioner's taxable income in this case. Petitioner's attack on the net worth computation prepared by the respondent centers upon the livestock carry-over from one year to the next during the years here involved. Petitioner does not dispute the accuracy of the bulk of the figures used in determining his worth and we accept such undisputed figures as correct. The difficulty in determining a reasonable carry-over of livestock from one year to the next during the years 1942 and 1944 through 1947 stems largely from the petitioner's own method, or rather, lack of method, of computing the head of cattle and other livestock on hand at the end of each year. Petitioner, at the end of each year, did nothing more than make a rough estimate of cattle on hand and used such figures on his returns for those years in computing taxable income. These estimates are extremely unreliable, and, in fact, petitioner himself now considers them as wrong. Petitioner indicated on his return for 1942 that the livestock on hand as of December 31, 1941, had a cost basis of $141,760.03, but in his brief the petitioner insists that the true figure is $370,174.45. *113 Respondent, in his net worth computation, adopted the amount of $141,760.03, shown on petitioner's return, as the correct cost basis of livestock on hand as of December 31, 1941. We cannot accept this figure. There is testimony that petitioner, on that date, had some 2,623 head of cattle under a mortgage, which, at the cost given in evidence as $80 per head, yields a cost basis of at least $209,840. Assuming that only 80 per cent of the cattle were mortgaged, we determine that petitioner had at least 3,275 cattle on hand as of that date, which, at the same cost per head, gives a total cost basis of approximately $262,300. We have found as a fact that this represents the cost basis of livestock on hand as of December 31, 1941. Consequently, there does not appear to be any net taxable income for the year 1942 on the basis of the respondent's net worth computation, unchanged except for this new amount to be employed as the cost basis of the livestock. Respondent computed the cost basis of livestock on hand on December 31, 1943, 1944, 1945 and 1946 in the amounts of $259,892.30, $442,532.15, $402,777.10 and $750,532.95, respectively. In the absence of physical head counts, and in view *114 of petitioner's failure to adopt any consistent and reliable method of ascertaining his year-end livestock holdings, the respondent worked backward from a physical head count taken on September 27, 1947, which, so far as the record reveals, was the only actual head count made by the petitioner. Using that head count as a starting point, the respondent, relying on petitioner's records and memoranda, established the cost basis of livestock on hand on December 31, 1946 as $750,532.95. To arrive at the cost basis for livestock on hand as of December 31, 1944 and 1945, the respondent assumed that all livestock purchased in the last 90 days of each year was still on hand at the end of that year. We think that the respondent was completely justified in adopting this method. A similar cut-off method was used by accountants who had been employed by the petitioner in their effort to reach some fair and reasonable year-end amounts. Petitioner's lack of proper record keeping compelled this. Moreover, it appears that the cost basis of $750,532.95 computed by the respondent for December 31, 1946, which was based upon the physical head count taken on September 27, 1947, actually represented the purchase *115 of livestock by the petitioner during the last 86 days of 1946. There is also evidence that cattle were kept in feed pens for as little as 30 days between the time of purchase and the actual marketing. Petitioner argues that some cattle, when purchased, were too light for immediate feeding and consequently, were grazed for a period of time. We are not shown that petitioner's grazing operations were anything more than a minor portion of his over-all operations, so that even if the period of time elapsing between the purchase of such cattle and their marketing exceeded 90 days, we cannot say, in view of the whole record, that it would distort the amounts determined under the respondent's 90-day cut-off method. Actually, there is evidence that the petitioner's purchases were concentrated on cattle which required relatively short periods of feeding. In determining the reasonableness of the determinations made by the respondent of the livestock on hand at the various dates, we have been guided, as well, by the financial statements submitted by the petitioner to the bank in applying for loans, by the bank's liability ledgers, by the mortgage abstracts filed in the proper counties of Iowa, *116 and by the testimony presented on the point. We cannot agree with petitioner that the use of the 90-day cut-off used by respondent makes the whole net worth computation unreliable. In W. A. Shaw, 27 T.C. 561, 569, we said: "It is obvious that the job must, in some fashion, be done, for a taxpayer cannot be permitted to evade the audit, proper computation, and assessment and collection of taxes by his failure to maintain the records required by law. * * *" Petitioner does not direct any argument towards the amounts operating expenses, depreciation, personal expenses, or certain unexplained withdrawals from bank accounts during the years here involved, and, accordingly, we find that they are correct. Similarly, we find correct the amount of $69,288.56 representing a debt owed to petitioner by the Harry Schroeder Cattle Co., Inc., and John Grudle on December 31, 1947. Petitioner disputes the amounts computed by respondent in his net worth determination as representing the cost basis of the investments by petitioner in Harry Schroeder, Inc. and in Harry Schroeder Cattle Co., Inc. Our examination of the evidence convinces us that the figures used by the respondent are correct, and we have *117 so found in our findings of fact. Petitioner concedes that the amount of real estate shown on the respondent's net worth computation is correct for each of the years, except for a small portion of the cost basis allocated to the R. E. Lucas farm. It is petitioner's contention that some corn was purchased along with the farm and that consequently a portion of the purchase price should be allocated to the corn. However, apart from some very vague and unsatisfactory testimony by the petitioner, there is nothing in the record to show what, if any, corn was included in the purchase. Petitioner has not met his burden on this point and, consequently, we sustain the respondent. Respondent, in his notice of deficiency, determined that the petitioner sustained a net loss from business operations in 1948 in the amount of $230,637.25. In his net worth computation for that year, however, respondent established a net loss for 1948 of $209,702.14. We have given careful attention to the various items in the net worth computation and to all the evidence bearing upon such items, and we are persuaded that, subject to our findings on relevant items in the respondent's net worth computation for the prior *118 years, the determination of the respondent of the net operating loss for 1948 is correct. Petitioner is entitled to a net operating loss deduction for 1946, carried back from 1948, based upon this holding. Section 122, Internal Revenue Code of 1939. It appears that in computing the amount of the carry-back to 1946 from 1948, the respondent, in his statutory notice of deficiency, allowed a non-business expense in the amount of $12,070.48, representing Iowa income tax. Respondent on brief contends that this was an error, and we agree. Petitioner offers no argument on this point. In computing the deficiency for 1946, effect will be given to this disallowance of the item. Respondent, in his net worth computation for 1949, determined a net loss for that year of $170,024.36, and concedes that petitioner is entitled to a deduction in 1947 of $166,396.69 by reason of a net operating loss carry-back from 1949. Section 122, Internal Revenue Code of 1939. We have examined the items, and the evidence on such items, of the net worth computation and are shown no reason for disagreeing with them. Therefore, subject to our findings on items included by the respondent in his net worth computations *119 for prior years, we hold that the respondent was correct in his computation of the net loss and the net operating loss carry-back for the years 1949 and 1947, respectively. Respondent determined an addition to tax under section 291(a) for 1946 due to petitioner's failure to file a timely return within the time prescribed. Petitioner received a 30-day extension for filing his 1946 income tax return, and on April 15, 1947, he signed and filed a return which was blank except for a net income figure and the tax due. There were no schedules or computations shown. It is obvious that such a return does not meet the requirements set out by section 51 of the 1939 Internal Revenue Code. National Contracting Co., 37 B.T.A. 689, affd. 105 Fed. (2d) 488; Leo Sanders, 21 T.C. 1012, affd. 225 Fed. (2d) 629, certiorari denied 350 U.S. 967. We have been offered no evidence by the petitioner to show that his failure to file a timely return for the year 1946 was due to reasonable cause and not due to wilful neglect. We sustain the respondent on this issue. The respondent determined that a part of the deficiencies for 1942 and 1944 through 1947, inclusive, was due to fraud with an attempt to evade *120 tax. Our finding of an increased inventory of livestock on hand as of December 31, 1941, eliminates the net taxable income determined by the respondent in his net worth computation for the year 1942. Therefore, absent any deficiency, we do not discuss the fraud issue for that year. The burden rests upon the respondent to prove fraud by clear and convincing evidence. Arlette Coat Co., 14 T.C. 751. There were consistent understatements of income of a substantial nature over the years before us. Petitioner reported income for the years 1944, 1945, 1946 and 1947 in the sums of $487, $11,840, $51,500 and $249,506, respectively. The completely unrealistic nature of his reported income is graphically demonstrated by the net worth computation and the profit and loss statement prepared by respondent, which computations we have, on the basis of the entire record, sustained, and which show unreported income for the years 1944, 1945, 1946 and 1947 in the amounts of $163,609, $148,379, $364,140 and $61,149, respectively. Such a pattern of repeated gross understatements of income without an adequate explanation is evidence of fraudulent intent. Schwarzkopf v. Commissioner, 246 Fed. (2d) 731 *121 (July 10, 1957), affirming a Memorandum Opinion of this Court [15 TCM 762,; T.C. Memo. 1956-155]; Kilpatrick v. Commismissioner, 227 Fed. (2d) 240, affirming 22 T.C. 446. We are persuaded from the impressive growth in the scope of petitioner's operations and from the financial statements filed by petitioner with his bank over these years, that the petitioner was fully aware that his income was not accurately reported in his returns for those years. Our findings reveal a marked discrepancy between the small amounts of taxable income reported by petitioner in those years and the amounts as determined by the respondent in his net worth computation. Another strong indication of fraud on petitioner's part is the matter of the altered checks. Approximately 20 checks were made out by petitioner for payment of real estate purchased by him in each of the years 1944, 1945 and 1946. After these checks were cashed, notations regarding real estate were erased and new notations were placed on the checks indicating that the amounts were payment for corn, fodder and other operating expenses. Petitioner, in 1946, purchased a Reo truck at a price of $2,638.49, which amount he paid by check. In the *122 lower left hand corner of the check a notation was made that it was in payment for approximately 1,600 bushels of corn at $1.65. It is to be noted that, for the most part, the notations indicated that the full amount of the check was for these various operating expenditures. This reveals the weakness in petitioner's attempt to explain such notations by saying that they resulted from an attempt to find out what portion of each real estate purchase represented non-real estate items. It fairly appears that petitioner deducted as an operating expense for the years involved the amounts indicated on the altered checks. Petitioner conducted large scale feeding operations during the years here involved, and he impressed us as an intelligent businessman. We hold, after an examination of the entire record, that a part of the deficiencies for each of the years 1944 through 1947 was due to fraud with intent to evade tax. Respondent makes some argument that the returns for the years 1944 and 1945 were intended to be joint returns and therefore Amanda would be jointly and severally liable for the deficiencies and additions to tax for those years. Petitioner introduced his tax returns for those years. *123 They purport to be his individual income tax returns and they are signed only by him. So far as we can determine, the only income reported is for petitioner's livestock feeding operations. The only finding of fact which the evidence of the returns warrants is that they were the individual returns of the petitioner, and we so hold. There is no dispute that the returns for the years after 1945 were joint returns. Decision will be entered under Rule 50. Footnotes
a. Does not include $9,026.54 from the Schroeder-Grudle partnership. ↩
b. Includes United Statessubsidy of $23,443.50, but not feed and corn sold to Schroeder-Grudle partnership, amounting to $69,801.87. c. Includes sale of cattle by Schroeder-Grudle joint venture, and sales of grain.↩
a. Exclusive of gross receipts from sale of cattle by Schroeder-Mactier joint venture.↩
a. As indicated on the tentative return. The final return, filed on July 15, 1948, reflected a net income of $243,099.64 and a tax liability of $185,374.14. ↩
b. Petitioner filed an amended return for 1947 on July 31, 1948 in which he reported taxable income of $249,506 and a tax liability of $190,480.55.↩
*. This amount was reported on a tentative return filed for 1946. A final return, filed on July 31, 1948, reported a net income of $243,099.64.↩
*. On petitioners' return for 1946, the livestock costs carried to 1946 from 1945 are shown as $496,281.↩